# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 13, 2013 Session

## STATE OF TENNESSEE v. SHANTERRICA MADDEN

**Appeal from the Circuit Court for Rutherford County**
**No. 66473     Hon. Don R. Ash, Judge**

---

**No. M2012-02473-CCA-R3-CD - Filed March 11, 2014**

---

The defendant was found guilty after trial by jury of second degree murder and tampering with evidence.  She received an effective sentence of twenty-nine years.  On appeal, the defendant claims that the trial court erred by denying her motion to recuse, that her constitutional rights were violated by the manner in which the trial court allowed jurors to ask questions during her trial, and that her sentence is excessive.  After review, we find that the defendant has failed to establish her entitlement to any relief on these claims.  We affirm the judgments of the trial court accordingly.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, J., joined and CAMILLE R. MCMULLEN, J., wrote a separate concurring opinion.

Joe Mason Brandon, Jr., Murfreesboro, Tennessee, and Laurie Young, Murfreesboro, Tennessee, for the appellant, Shanterrica Madden.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; William C. Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On March 2, 2011, the defendant stabbed the victim—her college roommate, Ms. Clantina Stewart—to death.  As a result of the incident, on July 5, 2011, the defendant was indicted on one count of first degree murder in violation of Tennessee Code Annotated section 39-13-202, and one count of tampering with evidence in violation of Tennessee Code

Annotated section 39-16-503. The evidence later presented at the defendant's trial reflected that the incident was the culmination of a dispute between the two roommates, one which arose over the defendant's marihuana use in the apartment and her anger at the victim because the victim was allowing her boyfriend to stay at their apartment to a degree that the defendant deemed excessive.

Prior to trial, the defendant filed a motion for recusal of the trial judge. The motion was based on the defendant's allegation of the discovery of a "substantial and material connection" between the trial judge and the women's basketball program at Middle Tennessee State University (MTSU), in which the victim was a star player. The motion referenced the fact that the judge was an MTSU graduate, recipient of a distinguished alumni award, and a substantial donor to the MTSU community. The motion also alleged that the judge had spoken at MTSU graduations and had pictures of the events hanging in the jury room. The motion alleged bias in the form of the trial court's denial of the defendant's motion to waive her appearance at her arraignment—something the defendant alleged the trial court had not done at "any other time in history"—and the fact that the trial court had set the defendant's case for trial in an "extremely short period of time since [the defendant's] plea date."

At a hearing held on December 21, 2011, the trial court expressed skepticism concerning the defendant's motion, noting that both the defendant and the victim were MTSU students at the time of the incident. The defense counsel responded by noting that the judge had 205 "Facebook" connections to individuals at MTSU and was "Facebook friends" with Mr. Rick Insell, a basketball coach who was expected to be one of the State's witnesses. The trial judge noted that he had over 1500 "Facebook friends." Undeterred, defense counsel pointed out that there were numerous comments related to the victim that were accessible from Mr. Insell's Facebook page. The trial judge asked defense counsel if he had any proof that the judge had "visited" Mr. Insell's Facebook page, and defense counsel responded that he had no way of determining that, especially after the trial court had "sent [him] an order that [defense counsel] had invaded [his] privacy and . . . created a security risk" after he "fil[ed] the Facebook stuff." Defense counsel did note that the trial judge had posted numerous comments about the MTSU men's basketball program on his Facebook page. Defense counsel also noted that the trial court had "unfriended" numerous individuals connected with MTSU after defense counsel had filed the motion to recuse, an action which he viewed as "suspicious."

After listening to these arguments, the trial court denied the defendant's motion. Concerning his Facebook connection to the potential State witness, the trial court explained, "[t]o be quite honest I didn't think my facebook page was public." He further explained that he had originally believed that defense counsel "had hacked into my account or got

-2-

somebody to pretend to be my friend and went through all that stuff." He explained that he had started using Facebook because, as a judge, he did not "really get to know" the attorneys practicing in front of him, and he thought that connecting with lawyers on Facebook "might make [him] be a better lawyer or a better judge to understand that people that come up here as lawyers that they've got lives outside of that." The trial court stated that, "if that's a mistake . . . I acknowledge that mistake."

The trial judge then *sua sponte* admitted into evidence an affidavit that he had apparently solicited from Mr. Insell. In the affidavit, Mr. Insell claimed that he was not "Facebook friends" with anyone named "Don Ash."[1] Mr. Insell also attested that he currently had more than 4900 "Facebook friends" and that he had "never met or spoken with the vast majority of [his] Facebook friends." He attested that to his knowledge, he had "never corresponded directly or individually with Judge Ash through Facebook or any other means."

Next, the trial court introduced a transcript of the defendant's arraignment hearing and cross-examined defense counsel concerning its contents. After highlighting certain portions of an earlier exchange with defense counsel, the trial court asserted that it had never denied the defendant's request to waive her presence at her arraignment and implied that the defendant had attended her arraignment voluntarily. In a testy exchange, defense counsel disagreed with this assessment. The trial court also noted that defense counsel had not objected to the trial date at the time that it was set. In another testy exchange, defense counsel disagreed with the trial court's understanding of what had occurred at the earlier hearing.

The trial court continued by noting that MTSU was a prominent organization within the community and that "[s]adly I have a lot of MTSU students who come through criminal court." The court claimed that even if he granted the defendant's motion to recuse, any other judges who might be appointed also had connections to MTSU, including one judge whose "dad has a building named over there for him" and another whose "wife works there." The court ultimately concluded that his "connections with MTSU ha[d] absolutely nothing to do with the case." Before concluding the hearing, the trial court chastised defense counsel for making a "false statement" concerning what had transpired at the defendant's arraignment and for filing a motion that called into question the people's faith in the judicial system and "diminishe[d] our entire court system."

At the defendant's trial on May 9-14, 2012, the evidence presented generally established that the defendant and the victim were assigned as roommates by an apartment

---

[1] The trial court noted that this statement was true because he had "unfriended" Coach Insell two days before requesting the affidavit.

complex in the Fall of 2010 and did not know each other prior to rooming together. At first, the two young women got along reasonably well. Then, in January 2011, the victim's boyfriend, Mr. Anuna, began spending a considerable amount of time at the apartment, remaining in residence even during time periods when the victim was not present. The defendant complained about this behavior to her mother, indicating that she was especially concerned because Mr. Anuna had once entered the apartment unannounced while she was alone in the shower. When the defendant's mother called the apartment complex to complain about the situation, the apartment complex tried to arrange a "sit-down" meeting between the two girls. This turn of events angered the victim, who responded by playing loud music and giving the defendant the silent treatment. Eventually, the victim promised the defendant that her boyfriend would spend less time in the apartment. The victim apparently honored this commitment for a few days, but when Mr. Anuna started spending every night at the apartment again, the defendant left and started spending most nights with a friend.

In the late afternoon hours of March 2, 2011, the defendant and her friend, Renee Reese, returned to the apartment that the defendant shared with the victim. Mistakenly believing that the victim was not present in the apartment, the two decided to smoke marihuana. The victim, who was located in her bedroom, detected the activity and called the police on the pair, claiming that she was concerned that she would test positive for marihuana (due to secondhand smoke) and lose her basketball scholarship as a result. A contemporaneous series of vitriolic "tweets" sent from the victim's cell phone, however, revealed that the defendant's dislike of the victim was her primary motivation for reporting the activity.

A police officer, Officer Jenson, responded to the call. After requesting and receiving the defendant's consent to search the apartment, the officer discovered a marijuana "roach" in an ashtray. He instructed the defendant to flush the roach down the toilet and left.

Immediately afterward, the defendant went to the victim's door and demanded to speak with her. When the victim opened the door, the two engaged in a physical altercation. The altercation ended when the defendant stabbed the victim. When the defendant left the victim's room, Ms. Reese, who remained nearby, saw blood on the defendant's arm and asked the defendant what had happened. The defendant responded that she herself had been cut and that the victim was okay. Sometime later, Ms. Reese observed a broken knife fall out of a blanket carried by the defendant. She also saw the defendant place the broken knife and a blanket in a plastic garbage bag. After witnessing these events, Ms. Reese left the apartment. The defendant followed her, and Ms. Reese observed the victim's cell phone stuck in the defendant's bra. When the defendant saw that Ms. Reese saw the victim's cell phone, she pushed it deeper inside her bra.

Several individuals attempted to contact the victim in the moments following her stabbing, as she had been on the phone with someone and sending periodic tweets prior to the defendant's arrival at her bedroom door. In response to these inquiries, someone sent text messages from the victim's cell phone, saying, "I about to get in the shower" and, about twenty minutes later, "I am out of the shower."

Mr. Ananu arrived at the apartment and demanded to know the victim's whereabouts. The defendant told him that the victim was not there. Mr. Ananu entered the apartment anyway, and he discovered the victim inside her bedroom, barely clinging to life. He yelled at the defendant, chased her from the apartment, and called 911. When police arrived, an officer saw the defendant "appear from behind a row of cars [in the apartment's parking lot] facing away from the complex[,] and [she] began running away." The officer instructed the defendant to stop, but she continued to flee. The officer gave chase, and the defendant surrendered just before being caught.

The defendant gave several different statements to police. In the first statement, the defendant acknowledged that she and the victim had argued but denied killing her. She claimed she had left the apartment following the argument, and on the way out she had seen a 5'6" black male who she claimed was enraged and looking for the victim lurking outside. In the second statement, the defendant acknowledged stabbing the victim, but she claimed she had done so by accident. She claimed that when she entered the victim's room, the victim had a knife on the bed, and at some point she picked up that knife and the victim accidentally fell onto it. In her final written statement to police, the defendant acknowledged that she had entered the victim's room and had a heated argument with the victim. She stated that as she tried to leave, she "bumped into [the victim] slightly," and the two pushed each other. She claimed that when the victim saw that the defendant saw a knife on the victim's bed, the victim pushed her to the ground and started beating her head. She claimed that she grabbed the knife, and when the victim let her go she stuck the knife out in front of her chest for protection. She claimed that as the victim was moving toward her, she pushed the knife upward and stabbed her in the chest a single time.

The coroner, Dr. Amy McMaster, testified that during the autopsy she determined that the victim had injuries caused by an instrument with a sharp cutting edge. Her primary injury was to the right side of her chest, where the victim had suffered a stab wound two inches deep that had caused significant injury to her aorta and right lung. She also had a superficial stab wound on the back of her left shoulder. The coroner testified that the victim also had "linear abrasions" associated with that stab wound and another small superficial linear abrasion on the back of her upper left arm. Finally, the victim had "an additional very superficial stab wound [to] the back of her left neck area." The coroner testified that the victim died as a result of the stab wound to her chest, which caused major blood loss, filling

the victim's lungs.

The jury ultimately found her guilty of the lesser-included offense of second degree murder, a Class A felony, and guilty as charged of tampering with evidence, a Class C felony. At the sentencing hearing on July 17, 2012, the defendant's father took the stand and testified that his daughter was a child of God who had never been in trouble previously. He acknowledged the loss caused by his daughter's actions and apologized to the victim's family. Defense counsel also read into the record a letter from the defendant in which she apologized for the pain that she had caused to the victim's family and begged for their forgiveness. After receiving this testimony, the trial court heard arguments from the attorneys and considered enhancing and mitigating factors pertaining to the murder conviction. The court found that the defendant possessed or employed a deadly weapon during the commission of the offense as the sole enhancing factor. The court found the fact that the defendant had never previously been in trouble with the law as the only mitigating factor. The court found that the enhancing factor outweighed the mitigating factor and imposed a sentence of twenty-five years. With respect to the defendant's conviction for tampering with evidence, the trial court found no enhancement factors and the same mitigation factor before imposing a sentence of four years. Because the trial court further found that (1) the defendant was a dangerous offender; (2) an extended sentence was necessary to protect the public against further criminal conduct by the defendant; and (3) consecutive sentencing was reasonably related to the severity of the defendant's offenses, the trial court ordered the defendant to serve her sentences consecutively, resulting in a total effective sentence of twenty-nine years.

The defendant filed a timely notice of appeal. We proceed to consider her claims.

**ANALYSIS**

The defendant claims that the trial court erred by denying her motion to recuse, that her constitutional rights were violated by the manner in which the trial court allowed jurors to ask questions of the witnesses during her trial, and that her sentence is excessive.[2] After review, we conclude that the defendant failed to demonstrate any prejudice resulting from the trial court's denial of her motion to recuse or decision to permit juror questioning and that

---

[2] The defendant's brief also lists "whether there was sufficient evidence to support [the defendant's] conviction as an issue presented for review. However, this claim is not supported by any argument, nor does the defendant direct us to any place in the record that might allow us to discern the specific nature of her challenge. In any event, we note that the defendant's written confession to the police contains all of the necessary elements of a second-degree murder, and her written confession was supported by considerable circumstantial evidence, which we have already summarized.

her sentences are reasonably related to the severity of her offenses. Consequently, the defendant is entitled to no relief, and the judgments of the trial court are affirmed.

## I.

The defendant claims that the trial court erred by denying her motion to recuse. "As a matter of custom and law, recusal decisions are made by the trial judge himself or herself." *State v. Hester*, 324 S.W.3d 1, 72 (Tenn. 2010). "Whether a judge should recuse herself or himself from a legal proceeding rests within the sound discretion of the judge." *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008) (citations omitted). This Court will not interfere with the trial court's decision on appeal unless the record clearly shows an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court has applied an incorrect legal standard or has reached an illogical or unreasonable decision which causes an injustice to the complaining party. *See Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009).

A fair trial before an impartial tribunal is a fundamental constitutional right. *See, e.g.*, Tenn. Const. art VI, § 11 (judges may not preside over cases in which the judge "may be interested, or where either of the parties shall be connected with him by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have been of counsel, or in which he may have presided in any inferior Court."). A court should grant a motion to recuse "'when the judge has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Smith v. State*, 357 S.W.3d 322, 341 (Tenn. 2011) (quoting *Bean*, 280 S.W.3d at 805). "Not every bias, partiality, or prejudice merits recusal." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). To disqualify, prejudice must be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." *Id.* Adverse rulings, without more, are not sufficient grounds to establish bias. *Id.*

The Tennessee Supreme Court has provided additional direction for courts concerning recusal. The rule in effect at the time the defendant filed her motion was Tennessee Supreme Court Rule 10, Canon 3(E)(1):[3]

A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to

_____

[3] This Rule was in effect until July 1, 2012, when it was replaced by Tennessee Supreme Court Rule 10, Rules of Judicial Conduct 2.11. *See* Sup. Ct. R. 10B (2012).

instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

Sup. Ct. R. 10, Canon (E)(3) (2011).

The parties do not dispute that the trial court had numerous contacts with the basketball program at MTSU. It is also undisputed that the trial judge had a connection through Facebook to one of the State's witnesses at trial. The defendant also complains about "the temperament which the trial judge displayed to [the defendant] and her counsel." The defendant maintains that "even a cursory reading of the transcripts" makes the judge's anger at the recusal motion "abundantly clear," and we agree. The question, however, is whether these facts suffice to establish an abuse of discretion.

We believe they do not. The defendant in this case has failed to identify any concrete manner in which she was disadvantaged by any bias on the part of the trial court. The defendant maintains that the trial judge showed bias by allowing jurors to ask questions of some but not all of the trial witnesses. However, this issue does not involve Mr. Insell, the witness with whom the judge was Facebook friends, and the defendant does not otherwise tie the issue into the trial judge's contacts (online or otherwise) with the MTSU basketball program. The defendant also insinuates that the defendant was denied her right to

confrontation and was not allowed to be present during every stage of the criminal trial. The defendant claims that "the trial court created an environment where there is certainly circumstantial evidence that she was denied presence at all stages." However, the defendant does not cite to the record or otherwise identify this circumstantial evidence or direct us to where it may be found. Simply establishing that a trial judge is acquainted with a lawyer or other person connected to a case does not, without more, suffice to establish an abuse of discretion in the denial of a recusal motion. *See Charles Hayes v. State*, No. M2000-02360-CCA-R3PC, 2001 Tenn. Crim. App. LEXIS 652, at *18 (Tenn. Crim. App. Aug. 23, 2001) (abuse of discretion not shown in denial of a recusal motion where "the trial judge did not appear to have based his . . . decision on his personal knowledge of the case"). There must be some sort of a connection shown between the judge's relationship with a lawyer, party, or witness and some action taken in the case. *See, e.g.*, *Mohamed F. Ali v. State*, No. E2001-00183-CCA-R3-PC, 2003 Tenn. Crim. App. LEXIS 333, at **57-58 (Tenn. Crim. App. Apr. 11, 2003).

In holding that the trial court did not abuse its discretion by denying the defendant's motion, we do not mean to imply that we condone everything that occurred in the court below. If the public is to maintain confidence in our system of justice, a litigant must be afforded the "'cold neutrality of an impartial court.'" *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998)). The overall tenor of some of the questions asked and statements made by the trial court to defense counsel during the hearing concerning the defendant's recusal motion reveal that the trial judge was upset, perhaps because he felt that defense counsel had violated his privacy by visiting his Facebook page (and the pages of individuals listed as his "friends" on that page). However, the record reflects nothing other than zealous representation on the part of defense counsel.

Our supreme court has made clear that "[t]he Code of Judicial Conduct does not require judges to remain isolated from other members of the bar and from the community." *State v. Cannon*, 254 S.W.3d 287, 308 (Tenn. 2008). When engaging in physical and on-line contact with members of the community, however, judges must at all times remain conscious of the solemn duties they may later be called upon to perform. Perhaps someday our courts will follow the lead of Maryland, which has concluded that its judges must accept restrictions on online conduct that might be viewed as burdensome to ordinary citizens and prohibits the "friending" of attorneys and witnesses likely to appear before a judge. *See* Maryland Judicial Ethics Committee, No. 2012-07 (2012). In the meantime, judges will perhaps best be served by ignoring any false sense of security created by so-called "privacy settings" and understanding that, in today's world, posting information to Facebook is the very definition of making it public. A judge's online "friendships," just like his or her real life friendships, must be treated with a great deal of care.

The defendant has failed to establish any bias or prejudice resulting from the trial court's decision to deny her motion to recuse. Her claim for relief is therefore denied.

**II.**

The defendant claims that the trial court erred by allowing jurors to ask questions of witnesses during the trial and also erred in the manner that it handled those juror questions. "Generally, the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. James*, 315 S.W.3d 440, 460 (Tenn. 2010) (internal quotations omitted). As we have stated, an abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches an illogical or unreasonable decision which causes injustice to the complaining party. *See, e.g., Bailey*, 280 S.W.3d at 805.

We begin by noting that the practice of permitting jurors to ask questions during a trial was once strongly disfavored in this state, with our courts once "describing the procedure as 'a perilous practice which trial courts should scrupulously avoid.'" *James*, 315 S.W.3d at 458 (quoting *Branch v. State*, 469 S.W.2d 533, 534 (Tenn. Crim. App. 1969)). However, more than a decade ago a shift in the law occurred when our state adopted Tennessee Rule of Criminal Procedure 24.1(c), which provides as follows:

> In the court's discretion, the court may permit a juror to ask a question of a witness. The following procedures apply:
>
> (1) Written Submission of Questions. -- The juror shall put the question in writing and submit it to the judge through a court officer at the end of a witness' testimony. A juror's question shall be anonymous and the juror's name shall not be included in the question.
>
> (2) Procedure After Submission. -- The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be asked. The judge may ask the juror's question in whole or part and may change the wording of the question before asking it. The judge may permit counsel to ask the question in its original or amended form in whole or part.

Tenn. R. Crim. P. 24.1(c)(1)-(2). Our supreme court has now made clear that juror questions are no longer disfavored, and furthermore, that minor deviations from the approved procedure for asking those questions are not grounds for finding an abuse of discretion. *See James*, 315 S.W.3d at 460 (holding that the trial court acted within its discretionary authority

-10-

in establishing the procedure for juror questions notwithstanding the fact that the trial court permitted further cross-examination of a witness after juror questions had been posed).

In this case, the defendant argues that our court should recognize the inherent dangers of juror questioning and "follow the reasoning of states that have prohibited juror questioning in criminal cases." We lack the authority to comply with the defendant's request, as our supreme court's holding in *James* is squarely controlling on this issue. If, by making this argument, the defendant seeks to preserve this issue as a potential grounds for appeal to our supreme court, she has done so.

The defendant also complains that the trial court in this case failed to comply with the requirements of Rule 24.1(c), because: "a juror asking a question was identified and placed on the record," and, with respect to at least one witness (a detective introducing content from the victim's Twitter account), "[s]ome questions were asked some were not." With respect to the first issue, our review of the records leads us to conclude that it was defense counsel who identified the juror and placed the juror's identity on the record. A party's own sound trial tactic does not generally provide any basis for reversal. With respect to the second issue, the defendant does not identify the questions that she alleges were not asked. It appears from the record that the defendant is referring to an instance in which a juror attempted to submit a question before the close of a witness's testimony, and the trial court returned the question with instructions to re-submit the question at the appropriate time. In so doing, the trial court appears to have followed the procedure described in Rule 24.1(c). In any event, both of these claims would reflect at most minor deviations from proper Rule 24.1(c) procedure and would not provide grounds for finding an abuse of discretion in light of our supreme court's holding in *James*.

Questioning by jurors is permissible in criminal cases pursuant to Rule 24.1, and the defendant has failed to show any sufficiently serious deviation from the procedure proscribed by that rule to establish an abuse of discretion. Her claim for relief is denied.

### III.

The defendant claims that her sentence is excessive. We review a defendant's challenge to an in-range sentence under an abuse of discretion standard. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) ("[T]oday we adopt an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."). In-range sentences imposed by trial courts will be upheld "[s]o long as there are . . . reasons consistent with the purposes and principles of sentencing" justifying the sentences imposed. *Id.*

Both the defendant's twenty-five year sentence for second degree murder and her four-year sentence for tampering with evidence fall within the applicable sentencing ranges in light of the defendant's offender status and offense grades. Consequently, we begin with the presumption that the defendant's effective sentence of twenty-nine years is reasonable.

The defendant has presented nothing to this court that would rebut this presumption. The defendant argues that she was a "very good" and "successful" student, as witnesses attested at trial, and she states elsewhere that she has never before been in trouble with the law. We note that the trial court gave credit to the defendant with respect to the latter issue as a mitigating factor, but it determined that this factor was outweighed by an equally applicable enhancement factor. We discern no flaw in this reasoning, and while the defendant's success as a student was laudable, it was not unreasonable for the trial court to conclude that this success was overshadowed by her heinous crimes.

The defendant in this case stands convicted of escalating an ordinary squabble between college roommates into an intentional homicide. Afterward, she took numerous steps to hide her crime from the victim's friends and investigating officers, and those steps might have succeeded but for the determination of the victim's former boyfriend in refusing to leave the apartment until he had seen the victim. The defendant made no apology for her crimes to the officer preparing her presentence report, instead stating, "I have no concerns at this time about my offense. . . ."

It is plain from the record that the defendant's rage and lack of impulse control rendered her, and continues to render her, dangerous to herself and others around her. After full review, we conclude that the defendant's twenty-nine year effective sentence fully comports with all relevant statutory principles and purposes of sentencing. The defendant's claim that the trial court erred by imposing an excessive sentence is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-12-